0832 people of the state of Illinois are going to be granted a Niford defendant's account. On behalf of the defendant's account, I'm going to be sharing a silver. On behalf of the plaintiff's affidavit, the value of the case is silver and may proceed. Good morning, Your Honors. Counselor, may it please the court, my name is Sherry Silver. I represent Mr. Niford in this appeal on behalf of the Office of the State Appellate Defender. Your Honor, there were three arguments raised in this appeal, the first one being a reasonable doubt sufficiency of the evidence issue. The second and third arguments necessarily include harmless error components. So I'd like to start with issue number two and then we would touch on the reasonable doubt factors in discussing the harmless error aspect. I'm happy to entertain questions on any of the issues, of course. In argument two, we questioned the ruling by the trial court on the state's motion in limine to borrow what it called irrelevant and prejudicial material. Far from being irrelevant was the allegation that IG stole money from the defendant's car. That evidence was evidence of her motive to actually make the claim against the defendant and to continue and pursue her complaint even after charges were leveled against Mr. Niford. Impeachment on motive and bias is a matter of right. The trial judge, therefore, was wrong in barring defense counsel from impeaching IG, especially on the theft from the defendant's car. Now, the date of that purported theft was when? We don't know. Year? We don't know. Logic would dictate that it was in 2013, but it's not definite. It's not definite from the record when that was. We know that there was another theft from a neighbor, and again, we're kind of guessing that that actually was the one that the station adjustment was entered on. There was an investigation into a theft. The prosecutor talked about it during the motion to reconsider. So was any discovery requested on that? That I don't know, Your Honor. By the defendant? I don't know. I know that there was discovery requested on the station adjustment, but I'm not sure about the other theft. I don't recall that being a subject of discovery. So that was closer to the time of the offense actually than to the trial date? Well, the trial date was in 2014, so it was a year. But she was put into mercy behavioral by her mother in April of 2013. In May of 2013, she made that outcry in the letter and everything in April of 2013. In May, the defendant was interviewed by Dunn and Lentner, and then the investigation continued. The charges actually came in, I believe it was either August or September of 2013. So we're only talking six months. Let's talk about the reality, though. It's a child. She was 13 years of age. She was a station adjustment, correct? Yes. I'm one of the thefts, yes. And there was no court involvement? At that point, no. And we don't know the dates of the other two alleged offenses? The animal cruelty or the— We don't know. What was the animal cruelty, beating a dog or something like that? It was beating the family dog. I do have information that counsel gave me outside of that. What relevance does beating a family dog have? It can be used as—we don't know what the station adjustment conditions were, if there were any. We don't know enough about the station adjustment. If there were conditions imposed on her, that could have been used as a violation, and it could have been used to curry favor with the prosecution. Is there any authority for using the station adjustment to impeach her? Not directly, but there's nothing saying you can't. We do cite statutes in our reply brief that deal with station adjustments and how they can be elevated to other charges, so that aspect in and of itself would be appropriate for impeachment. Certainly if a child is facing adjudication for a serious criminal offense, theft or whatever, but was there any indication that she was facing juvenile adjudication for any offenses? Well, just the station adjustment that actually was imposed for that one theft. But that was over. I don't know whether the station adjustment was completely over by the time of trial. I don't recall that from the record. It may have been. I just don't recall. But the fact is that it could have still been used. I don't know what conditions were imposed. Nobody got into that. But for the trial court—and my point is on the record, for the trial court to rule, isn't it your obligation to show that there is some realistic potential to impeach the witness with these prior— Well, motive is always realistic potential for impeachment. And the whole motive that comes out with her theft from the defendant's car, let them impeach her. Let them ask about it, let them impeach her, and then see what the jury believes at that point. It's true that the defense counsel did a pretty darn good job of cross-examining IG. I can't deny that. But the point is he was cross-examining her on what may have happened, the physical act, all those kinds of things. Also on the recantations. On the recantations, exactly. But not her motive. And that's what the jury should have heard. But the motive, you're arguing, is to incur favor with the state. No. The motive is that she was really—I won't use the word—she was mad at her uncle. She's a 13-year-old girl, 12 years old at the time. Having been a 12-year-old girl myself, you don't insult somebody like that. They're in a very tender age. You kind of got to watch what you say. He was acting as the disciplinarian in the household. And she was really ticked off. She was possibly undergoing some mental illness herself to begin with, but he was insulting her. He apparently brought a woman into the house, and she was—she said—I.G. said that he was disrespecting her and the house. She would yell back at her uncle. Her being? I.G. Herself. Right. Wasn't that being consistent with the defendant's own evidence? Meaning what, Your Honor? That from Juanita, that the mother, that I.G. and the defendant, she didn't see any problems between them before the disclosure? Well, but Juanita also testified that when he disciplined her, she would yell back, and there were arguments. Well, that's not uncommon. But at the same time, she testified that—and there were other witnesses who testified that were at the home, the two got along, cookouts, et cetera. Correct? In between her age of 6 and 12 and 13. Not from 12 years old and up. There is a difference in that. Was that brought out explicitly in the testimony that there was a difference in her behavior? Between the ages of 6 and 12 and then 12 and 13. I don't recall it being in the argument, the closing arguments, but it's certainly something the jury could have heard and could have taken into consideration. But the fact is they did not take into consideration what occurred between that time period prior to her being sent to Mercy Behavioral. So that all goes to the reasonable doubt issue, actually. And the primary focus of the reasonable doubt issue is whether or not actual penetration was proved. That's the issue. And on that matter, there's all the recantations that you just brought up. There were recantations, there were inconsistencies, there were different phrases that were used, and nobody asked her exactly what she meant. And nobody found out exactly what she meant. She said he put his penis in her butt. In her butt was found to be insufficient in Oliver to establish this. He testified that it was where the poop comes out. By where the poop comes out. Pardon me? She said it was by where the poop comes out. She did not say in where the poop comes out. And that's a big difference. That could mean on the cheek. It could mean just in the, when I put the definitions in the reply brief, the intergluteal cleft. I never knew that was a phrase. But it could have been there. We don't know. The fact is that the evidence is just insufficient to establish that there was actual penetration, or even content, however slight. She had also made the statement that she had been raped by the defendant. What does that mean to a 13-year-old kid? Well, again, we're not the jury. The reasonable inference is in order of the town's standing. We have to look at the evidence in the light most favorable to the state. Well, I would argue that sometimes to a 13-year-old kid at least, and for people interpreting her testimony, it could have been vaginal intercourse. And that was nowhere near in the evidence. Did the words of her letter say, put his thing in my butthole? Right, but she also said he tried to rape me. At page 22 of my brief, of the defendant's brief, we have her letter quoted. There's contradictions all over the place. I understand that. But it's not our job to sort through those. It's the jury's job to sort through and decide the credibility of the witness and to decide what actually happened. And our job is limited. We're talking about sufficiency of the evidence. But it's also this Court's job to reverse a conviction when it's improbable. And one of the most improbable things about her testimony was that she told Dunn and Lechner in her interview with them that there was pain. That was early on in the allegations. That was early on in the process. When she testified in front of the judges or in front of the jury, she said there was no pain. Logic, human experience, physical anatomy would have to lead to the conclusion that there would have been pain. Didn't the defendant's statements, at least in some ways, corroborate the victim's outcry as far as where this incident took place, how it took place, and his statement to the police that he attempted to put it inside, and his statement to Reed, albeit agreeing with Reed, that it was possible that there was penetration? I'm going to try and take each one of those factors. Yes, his statement to Dunn and Lechner and to Reed corroborated where it happened. And we're not saying nothing happened. We're saying something did happen. But did they prove the actual penetration beyond a reasonable doubt? No. And in that regard, your request is that we reduce the offense to aggravated criminal sexual abuse? Yes, that is our request on the basis of argument one, yes. If you don't agree that it should be reversed outright, you know, all or nothing kind of a deal, then absolutely. It should be reduced under Kennebrew and Colton, I think it is, to either the aggravated criminal sex abuse or even attempt-pred criminal sex assault. Either one of those, we would agree, would be a more appropriate conviction to enter and then send it back for sentencing. Isn't it just a classic jury question, though, as far as what version of these multiple basically versions that were given, which version that they would have believed? But that also goes to argument two. Yes, it is the jury's job to determine which version they're going to believe. But if they had the information about her motive to testify or to make these allegations, it could have tipped their decision. Well, now, the motive thing, I mean, are we talking about two different things with the motive? I mean, we're talking about the theft of the purse from the neighbor and the dog. Well, and theft from the defendant. No, I know, but let me say, that's the one side where you're talking about currying favor with the state. Right. Because that has nothing to do with the defendant, correct? Correct. I mean, he didn't discipline her for those things. Correct. That would still go to her bias afterwards and her need to maintain her story. Okay, well, then let's talk about those for one second. I mean, how is this unlike Schnur, where we said basically that that's a stretch, you're reaching, because the station adjustment, we don't even know whether it was still alive, what the conditions were, whether this was a violation. And in Schnur, the person was actually on probation. And we said that was a stretch because there was nothing to indicate that there were charges pending or that the witness was facing the violation of probation. So let's talk about those two first. Okay, and that is true. Yes, Schnur is distinguishable on those maps. Yes, absolutely. But I go back to the argument that when the station adjustment was entered, it left it open for her to have to stick to her story. Whether she was still on a station adjustment or not, it could still, the station adjustment facts, along with the theft from the defendant and the cruelty to the animal, which could have been a misdemeanor, class four felony, whichever one, those could be used to elevate that station adjustment if it was still alive. Did her occurring favor with the State have anything to do with her outcry in that letter at the Behavioral Center? No, I think her outcry at the Behavioral Center was her effort to get out of the Behavioral Center. And that came out in her interview with Dunn and Lechner. But I'm just saying, she makes this outcry, then she testifies fairly consistently with the outcry at trial. And then you're saying that she's trying to curry favor with the State, which has nothing to do with the outcry that she's testifying fairly consistently to at trial. I mean, it just seems like circular reasoning that never gets back to the beginning. The whole case begins with, I don't want to interrupt the question, but to follow up on Justice Burke's question, the whole case begins with this disclosure to a therapist, correct? The letter to the therapist, yes. And your suggestion is that that letter to the therapist that started this whole event, the whole investigation, was somehow the product of her concern over being charged with these uncharged offenses? Is that your theory? No, no. So her letter to the therapist was completely something that she did on her own, and it's not influenced by any hatred towards the defendant? It is an indication of hatred towards the defendant, absolutely. That hatred emanates from what? It emanates from his being the disciplinarian in the household, insulting her as part of somebody's testimony. Well, you just agreed that something did happen. You just said something did happen. The evidence establishes something did happen in that bedroom. But was she exaggerating? Was she exaggerating? So it's a mixture of bias against him plus exaggeration generated that letter to the therapist. I guess it could be boiled down to that, yes. To some extent, yes. And her hatred toward him was fully examined in cross-examination and by other witnesses. Yes, it was, but there was no definite. In fact, there was an objection. When the defense attorney tried to get into exactly what happened with the theft, there was an objection to that, and the objection was sustained. He could not get into it based on the pretrial ruling and that objection. That one thing is reversible error in this case. When all this other stuff came out, including the recantation, a bunch of family witnesses testifying that she was not truthful. I will quote from Triplett and from Davis v. Alaska. The inability to cross-examine and impeach someone on motive and bias is constitutional error of the first magnitude. And no matter how much want of prejudice there is, it cannot cure the error. So there's no harmless error analysis at all in that? I would say that if none, I might be pushing that with the court, but it's certainly a very strong harmless error argument. My buzzer went off. Are there any other questions? Okay. Just briefly on the other issue, you didn't address the special procedures. Would you agree that the Fallister, the Supreme Court case, basically rebuts your whole argument? And you didn't find Fallister in your research? Because that gives you directly the odds with the point you're making in bringing it up. Well, I do say that this court used it in Priola. It relied on, oh, sorry. I'm sorry. You relied on the wall on Priola. No, no. Priola, Priola, Fallister, Fallister. Right. Fallister is sub salientio with the rules. Right. But I do discuss Fallister in the reply brief. Pardon? I discuss Fallister in the reply brief. And I do, I do admit that. Your obligation is to advise us of cases that go against your argument in your opening brief. Absolutely, Your Honor. And that was my mistake. I just didn't get to Fallister. But I would now argue, and I did in the reply brief, that the Section 115.11 allows for a court to exercise their discretion. It uses the word may. Well, how do you exercise discretion? Do you agree that under Fallister we can examine the entire record and determine whether or not there was a proper exercise of discretion by the trial court? Yes. Yes. Thank you. And was there any showing that the press was excluded or any family members were excluded? No. And to that extent, I do admit that this record perhaps is not the best record for that issue. It was an issue I think still worth raising. But it may perhaps be better for something in a collateral challenge later on. Thank you. All right. Thank you, Counselor. Thank you, Your Honor. You don't want time for rebuttal after that. Mr. Jacobs, you may proceed. Thank you. Good morning. I'm Barry Jacobs on behalf of the people of the state of Illinois. May it please the Court and the Counsel. With the Court's permission, I'll turn to Issue 2 as well, since that was the thrust of Hellman's argument. This is a fairly simple response to this argument. The police contacts that I.G. had, all occurring prior to both her outcry and the defendant being charged and tried in this case, were very speculative information. This evidence is we know she may have been cruel to a family dog. She allegedly stole some cash from a defendant. And there was a 2013 station adjustment because she stole a purse from a neighbor who was a police officer, I believe. There's nothing in the record to indicate when at least the theft from the defendant allegedly occurred. And I'm assuming that this was reported in some sort of request for discovery. Was there an offer of proof by the defense? Not that I recall. In fact, I could almost definitively say there's nothing in the record that the defendant questioned what these particulars were about these police contacts. So to stand before the Court and say that this was proper evidence for bias impeachment is incorrect. Bias impeachment certainly is upright. However, the evidence has to give rise to an inference that there was leverage. What about the language in Pupil v. Triplett? The Illinois Supreme Court said defense counsel is entitled to inquire into such promises or expectations whether, and it's not just a promise from the state, but an expectation in the mind of the witness, whether based on fact or imaginary. That's a pretty broad statement by the Illinois Supreme Court, whether based on fact or imaginary. So why would the state even object? That's the law under Triplett. Whether based on fact or imaginary, the defense should be entitled to inquire into bias impeachment. And that's certainly true. However, I would point out in Triplett, the Illinois Supreme Court also upheld the ruling on this very issue that bias impeachment was improper when there weren't pending charges. That's in Triplett. It actually quotes a case from this court, the MERS case from, I believe, 1984, which talks about station adjustments and speculative police contact being an impermissible basis for bias impeachment. So it actually is very much on point in this case. Let's talk about station adjustment with the theft from the – again, I'm looking at these now two different ways. I mean, I've got the theft of the person and the cruelty to the dog, and then I've got the theft from the defendant, which may be a little closer, you know, to the mark. Or the theft from the defendant, whether it happened before or after the outcry, you know, shouldn't – if, in fact, she was disciplined, she stole from the defendant, she was disciplined for that by the defendant, wouldn't that go to a bias, interest bias, to testify at trial? It could. I'm just saying that the evidence is very speculative. I don't recall anything in the record that there was evidence that she had been disciplined for that by the defendant. And it would take issue for that or for anything else, for that incident, for the theft. There is – But if she was disciplined for other things, that would still give rise to a possible bias, right? Possibly. I would take issue with the characterization that he was a disciplinarian in the household. My recollection is he didn't live with the complainant and her mother at the time that this occurred and was visiting – he lived with his wife and was visiting or saw the – saw IG regularly, but was not the primary disciplinarian. That's a minor point, but nonetheless, incorrect. But there was evidence that he did discipline the child. I mean, some of the witnesses have said that. The – what the appellant is referring to, I believe, is an incident where the defendant, visiting the home, brought a girlfriend into the home and it upset IG, and she felt disrespected on that basis. I don't know if there was discipline in that case or not. It's not clear in the record. But turning to Argument 1, this – I would also say that the shortcomings that were present in Oliver, the reasonable doubt case, the shortcomings that were present in Oliver are not present in this case. There was ample evidence to find that IG's statements – well, her note, her 11510 statement to Glensher and Dunn, and her testimony to trial were all basically consistent as to time, place, who was present. And then we have the defendant's statements, which also corroborate all the time, place, and who was present as to what happened. This is not a case like Oliver where the testimony was unclear. She said in her – in her, but I believe in that case, but also made an out-of-court statement that it was along the cheeks. The court found that insufficient. This evidence is much more specific. IG, in her initial outcry note, which is what I'll call it, I believe stated that – he put this thing in my butthole. And then during a conversation with investigators Glensher and Dunn, this is April of 2013, while she was hospitalized, it's said that her uncle had raped her. She was six or seven around that age. He had pulled down her pants and put his stuff inside me. And then when she testified, it seems the appellant's argument is based upon the leading portion of the testimony. IG initially repeated, in response to the prosecutor's questions, he raped me. She repeated that probably three times. And the prosecutor attempted to determine more specifics and asked, where did he touch you? Or something to that effect. She indicated by butt, which is somewhat unresponsive, reported as by butt. But certainly that inconsistency alone, which she later goes on to describe, it went into the part of the poop or by the part of the poop comes out. Those inconsistencies, if we just look at the word by, are not so significant that the jury could not have found penetration in this case beyond a reasonable doubt, giving difference to the standard of review. On the last argument, the Faustner case is directly on point. As I cited in my brief, I would only point out, based upon something that the appellant said here today, Faustner did not limit its ruling to just partial closures. In that case, the court did consider that it was a partial closure. But it certainly doesn't indicate that Section 115.11 is limited to only partial closures. In this case, the court, it's unclear if anyone was actually excluded, if anyone was even present to be excluded. But the court didn't indicate it was closing the proceedings for the testimony of I.G. For all those reasons. Without making specific findings. Without making specific findings. However, there's nothing that requires specific findings. If you read the language of the. But I mean, and there's no findings either as to actually who is. I don't know if it's findings, but statements even for the record of OK, I'm excluding so and so and somebody else. The press is staying or there's nothing in the record. But 115.11 says may exclude in the court's opinion. I'll have to read it. The court may exclude from the proceedings while the victim is testifying. All persons who, in the opinion of the court, do not have direct interest in the case. The language seems to grant discretion, even if the court was being wrong about who had interest. It is a very broad. Specifically says other than the media. Right. So the media can never be excluded. And there's no evidence in this case that that occurred. When the case law talks about immediate family members always being allowed to be. Yes. Again, this record doesn't make it that there were family members for anyone. The defendant objected that the motions eliminate to these special special circumstances. Correct. The defendant objected that the motion eliminate to these special procedures, including the closing of the court. I would say yes. Wouldn't it then be incumbent upon the defendant to go further with that objection at the time of the closure to say who was being excluded? One would think. And on the special procedures, that's clearly a question of the court's discretion. This is a 13-year-old girl relating an account of her uncle. The court certainly had the discretion to look at her age, the difficult subject matter that she, although communicative, was not very, very communicative and could have allowed that motion. In fact, it allowed the motion to be maintained properly. Would you agree that it would be better to reserve that until the child is actually on the stand to see how well a child can communicate? I don't know if it's better, but I think that's more usual, yes. Did the defense renew their motion once the child was on the stand? I believe so, yes. If there are no other questions, it's the people's position that this court should, that the defendant's conviction for federal criminal sexual assault or I think it's assault. I'm forgetting. Let the conviction be affirmed. Thank you, Mr. Jacobs. Ms. Silver, do you have a little argument? Just very briefly. Let me start off just by asking, as I asked Mr. Jacobs, wouldn't it be incumbent upon the defendant who's objecting to the closure of the courtroom to make a record as to who's being excluded in violation of 11511? Yes, it would be. And that may be some issue that also could have been raised or may be raised in a post-conviction petition to have not put that on the record. That's absolutely true. So, again, I say that part of that issue probably is better for a collateral challenge, and I admit that. I do agree, though, that defense counsel did reiterate his objections to the special procedures before she testified. So, yes. The only other things that I wanted to address were that Mr. Jacobs made some mention of police contacts IG had prior to her outcry. I don't recall there being any police contacts prior to her outcry. I think it was only after the outcry, after the investigation began, so I don't know that that was factually correct. The other part was that Mr. Jacobs said that the defendant did not live with IG at the time. It's not real clear whether he lived with her at the time just prior to the outcry. There was a time period that he and his sister, Corinthian, lived with them, but when this incident allegedly occurred, it was not at their house. She had dropped them off to their house. Took it into his bedroom. Right. Is there any other questions? Thank you, Your Honor. Thank you. We thank the attorneys for their arguments today. The case will be taken under advisement, and we will be adjourned.